UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| TERESA OGLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   2:09-CV-317-PPS |
| | ) |
| WAL-MART STORES EAST, LP, | ) |
| | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Teresa Ogle brought this action against her employer, defendant Wal-Mart, asserting Title VII claims for sex discrimination and retaliatory demotion [DE 1]. Ogle alleges that Wal-Mart demoted her in retaliation for complaining to her human resources representative about discriminatory conduct and comments by her supervisor and another Wal-Mart manager. Ogle voluntarily withdrew the sex discrimination claim [DE 22]. This matter is now before the Court on Wal-Mart's motion for summary judgment on Ogle's remaining retaliation claim [DE 23]. For the reasons discussed below, the motion is **GRANTED**.

## BACKGROUND

Plaintiff Teresa Ogle began working for Wal-Mart as a part-time cashier in 1991 [DE 24-3 at 6]. Over the years she worked her way up the ranks of Wal-Mart, and in 2003, she was promoted to co-manager, which required her to manage and supervise a single Wal-Mart store [DE 24-3 at 8]. In February 2006, she received another promotion, this time to the position of market grocery merchandiser ("MGM"), which gave her responsibility over the grocery operations of ten Wal-Mart stores [DE 24-3 at 10 & 13]. As an MGM, Ogle was required, among other things, to analyze sales reports and provide the managers of the stores she oversaw

with training and strategic information on how to increase sales and meet budget expectations [DE 24-3 at 12 & 27].

Ogle's direct supervisor during this time was Steve Antonetti, the market manager for the Wal-Mart stores over which Ogle had responsibility [DE 24-3 at 10; DE 24-2, ¶ 3]. Antonetti did not evaluate Ogle's performance as an MGM in 2006 [DE 28 at 14]. But beginning in early 2007, Antonetti's reviews went from mildly to severely critical.

Ogle testified that, in March 2007, Antonetti cautioned her that "we can't continue to allow these stores to run like this," adding that she needed to "run cleaner stores," and "be more observant" [DE 24-3 at 113-114]. On April 11, 2007, Antonetti gave Ogle a formal written and oral performance review, where he noted a number of areas where she needed to improve her performance, including that Ogle needed to increase food sales and improve her communications with the stores under her supervision [DE 24-3 at 77 & 122-124]. Still, Ogle's "overall rating" for this review had her "on target" for meeting performance expectations [DE 24-3 at 79-80 & 124].

Ogle's subsequent performance reviews continued downhill. On May 21, 2007, Antonetti gave Ogle a written "coaching" evaluation, which indicated that she had failed to meet food-related and other business objectives that had been outlined in Wal-Mart's market business plan [DE 24-3 at 82-83 & 125]. Antonetti met with Ogle to discuss these deficiencies and the areas where Ogle needed to show improvement [DE 24-2, ¶ 17]. His written review outlined ten specific areas where she needed to show improvement, and warned that, if her performance did not improve, the next level of corrective action could be termination [DE 24-3 at 125].

On July 19, 2007, Antonetti gave Ogle another oral and written performance evaluation,

called a decision day coaching [DE 24-2, ¶ 18; DE 24-3 at 126]. As part of this evaluation, Antonetti explained to Ogle that she was continuing to fall below performance expectations, including by failing to show improvement in the ten areas outlined in her May 21, 2007 performance review [*Id.*]. The written evaluation specified that, if Ogle failed to show improvement in the areas outlined in the May 21, 2007 review, the next corrective action would be termination [DE 24-3 at 126].

Ogle was never terminated. But on August 24, 2007, Antonetti demoted her to the position of assistant manager, a role with fewer responsibilities and less compensation than even the co-manager position she occupied during 2003-06 [DE 24-2, ¶ 20; DE 24-3 at 34-35; DE 28 at 6]. Antonetti explained to her that the demotion was for poor job performance, and that he had discussed the decision with Cynthia Carlson, a human resources manager, and David Carmon, Antonetti's boss and a regional market manager for Wal-Mart [DE 24-3 at 37 & 74-77].

Ogle contends that the real reason she was demoted is because of a series of complaints she made to Carlson regarding sex discrimination, and, in particular, certain comments made by Antonetti and Carmon, which she found to be discriminatory. Ogle testified that she began complaining to Carlson about male favoritism in the workplace, including that Antonetti treated her and other women less favorably than men, as early as February or March of 2007 [DE 28-2 at 10 & 19].

Ogle also complained to Carlson about a comment that Carmon made during a July 13, 2007 team meeting that Ogle attended along with other managers and Wal-Mart personnel, including Antonetti and Carlson [DE 24-3 at 39-40 & 42-44]. During the meeting, Carmon commented that grocery operations—for which Ogle was responsible—are usually run by men

[DE 28-2 at 6]. Carmon made this statement in the context of a discussion about an underperforming store for which Ogle was responsible [DE 28-2 at 8], and which had a female co-manager [DE 28-2 at 7]. Ogle took issue with Carmon's remark, and Carlson from Human Resources backed her up. Ogle pointed out to him that grocery operations may have been exclusively male-supervised 20 years ago, but that this was no longer the case [*Id.*].

On that same day, Ogle observed that the male attendees of the market team meeting had gone to lunch together, and that she and the only other female among the six market team members, Angie Gaydos [DE 24-3 at 86], had not been invited to join them [DE 28-2 at 9].

The day after the team meeting, on July 14, 2007, Ogle complained to Carlson from Wal-Mart's Human Resources Department about Carmon's comment, telling her she "couldn't believe that [Carmon] had made that comment about grocery was r[u]n by mostly men" [DE 28-2 at 9-10].

Ogle also complained to Carlson about remarks Antonetti had made to her. In February or March of 2007, Antonetti made a series of derogatory remarks directed at Ogle, including telling her that she "was going to cause him to have a heart attack," that she embarrassed him, and that some days he "could just stab [her] eyes out with a fork" [DE 28-2 at 12]. Ogle contends that during this same time period, Antonetti referred to a male store manager named Shannon as "Cheryl" [DE 28 at 3].[1] When Ogle asked Antonetti why he used that name, another Wal-Mart employee, Bob Zalud, added, "I think he has gay tendencies, don't you, Teresa?" [*Id.*]. Ogle complained to Carlson about all of these remarks, including Antonetti's reference to the

---

[1]The portion of Ogle's testimony that she cites in support of the timing of this statement actually indicates that the remark occurred in early 2006, right after Ogle's promotion to MGM, not in 2007 [DE 28-2 at 11].

male store manager as "Cheryl" [DE 28-2 at 12-13], though the record is unclear as to when she did so [*Id.*].

On July 24, 2007, one month before her demotion, Ogle asked Carlson to review a letter that she had drafted and addressed "to whom it may concern," which she later sent to Carmon and other Wal-Mart managers [DE 28-2 at 13; DE 28-2 at 38-42]. In the letter, Ogle is critical of Antonetti's treatment of her, particularly Antonetti's reviews of her performance. The letter also references Antonetti's alleged remarks referenced above and made months earlier that Ogle is going to give him a heart attack and that he could stab her eyes out with a fork. [DE 28-2 at 41]. The letter also references the fact that Ogle believed that she was perceived as the "red-headed stepchild" in the workplace. *Id*.

## DISCUSSION

Ogle contends that Wal-Mart demoted her in retaliation for complaining about sex discrimination. Title VII prohibits an employer from discriminating against an employee because she has opposed a practice that Title VII has made "an unlawful employment practice," or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *See* 42 U.S.C. § 2000e-3(a). And discrimination because of sex or gender is obviously prohibited by Title VII. *See Hamm v. Weyauwega Milk Prods., Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003).

A plaintiff has two methods to establish a prima facie case for retaliation: direct and indirect. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007); *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Ogle does not employ the indirect method, which requires the identification of a similarly situated employee who did not engage in

statutorily protected activity. *Id.* So she must rely on the direct method of proof.

Under the direct method, Ogle must offer direct or circumstantial evidence that: (1) she engaged in a statutorily protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a causal connection exists between the two events. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008); *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Direct evidence requires "an admission by the decision maker that his actions were based upon the prohibited animus," *Rogers*, 320 F.3d at 753, which Ogle has not presented. Accordingly, she must rely on circumstantial evidence, *i.e.*, "evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Id.*; *see also Sylvester v. SOS Children's Vills. Ill., Inc.,* 453 F.3d 900, 902 (7th Cir. 2006).

The only adverse action that Ogle points to in her brief is her August 2007 demotion, [DE 28 at 12], and Wal-Mart does not dispute that this demotion to assistant manager was in fact an adverse employment action. The demotion led to Ogle receiving lower compensation and fewer supervisory responsibilities which plainly amounts to an adverse action under Title VII. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002).

So the only questions before the Court are (1) whether Ogle engaged in activity protected under Title VII; and (2) whether there is a causal connection between that activity and Ogle's demotion. As I discuss below, Ogle is unable to establish a triable issue as to either of these questions.

### I. Statutorily Protected Activity

As noted, the direct method requires that Ogle show she engaged in activity protected under Title VII. *Haywood*, 323 F.3d at 531. "[A]n employee may engage in statutorily protected expression . . . even if the challenged practice does not actually violate Title VII." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994). However, "the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000); *see also Hamm*, 332 F.3d at 1066 ( "Title VII protects an employee from retaliation for complaining about the types of discrimination it prohibits."); *Holland v. Jefferson Nat. Life Ins. Co.*, 883 F.2d 1307, 1315 (7th Cir. 1989) (plaintiff's allegations must concern "the type of activity that, under some circumstances, supports a charge of sexual harassment").

In other words, a "plaintiff must not only have a subjective (sincere, good faith) belief that [she] opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner*, 224 F.3d at 707; *see also Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 891 (7th Cir. 2004).

Ogle did not engage in statutorily protected activity. To be sure, Ogle thought that Antonetti was rude, overbearing, and too demanding. Although Ogle certainly complained about Antonetti, those complaints were not concerning "an unlawful employment practice" as is required by the statute. In other words, it isn't enough to simply complain about your boss or the workplace; the complaints must be about something that Title VII forbids. *Kodl v. Board of Education School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).

As we'll see in a moment, none of the complaints that she lodged with Carlson about

Antonetti were "protected activity" because none involved conduct that Title VII prohibits.

**A.     Carmon's Remarks at the July 13, 2007 Team Meeting**

Ogle's complaint about Carmon's team meeting remark – concerning grocery operations usually being run by men – is not protected because there is no evidence that she reasonably believed the incident violated Title VII.

Ogle does present evidence that she subjectively believed – *i.e.*, had a sincere, good faith belief – that, in objecting to Carmon's remark, she was opposing unlawful activity. Ogle opposed the comment right on the spot, directing her opposition to Carmon himself (her boss' boss) right in front of Antonetti and Carlson, and the other attendees at the meeting. And on the following day, she reiterated her opposition to Carlson privately. *Cf. Dey*, 28 F.3d at 1450 (plaintiff's good faith belief she was opposing unlawful conduct evidenced in part by her complaint to her supervisor after learning that the law protected her against the offending conduct); *see also Holland*, 883 F.2d at 1315.

So taking the evidence in the light most favorable to her, Ogle's next-day complaint to Carlson indicates that she subjectively believed that the comment was somehow unlawful under Title VII. But Ogle's subjective belief that she was opposing conduct that violated Title VII is not enough; her belief has to also be objectively reasonable. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269-71 (2001) (per curiam); *Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 533 (7th Cir. 2008); *Hamner*, 224 F.3d at 706-07. The only way that this remark can violate Title VII is if it constitutes harassment, and to do so it must be sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 67 (1986); *see also Holland*, 883 F.2d at 1315.

There's no question that Carmon's comment about grocery operations was tactless, as Carmon himself appears to have acknowledged given how quickly he backed off from it. But a complaint about an isolated instance of alleged sex discrimination (as Ogle contends this was) is not protected activity for Title VII retaliation purposes. *Clark County*, 532 U.S. at 269-71.

The *Clark County* case provides an apt example of why this is the case. In *Clark County*, the plaintiff complained that her male supervisor and a co-worker joked in a meeting about a job applicant's statement to someone that, "'I hear making love to you is like making love to the Grand Canyon.'" *Id.* at 269. The supervisor then said that he didn't understand the statement; the co-worker said he would explain it to him later, and then both men laughed. The plaintiff was offended by the exchange and indeed complained about it the next day to human resources. An adverse action was taken against her sometime later and she then filed suit claiming retaliation. *Id.* at 269-70. The Supreme Court found in favor of the employer, finding that "[n]o reasonable person could have believed that th[is] single incident . . . violated Title VII's standard." *Id.* at 271. The Court observed that the whole event was at worst an isolated incident that "cannot remotely be considered 'extremely serious,' as our cases require." *Id.*

As for Carmon's comment, which appears to have been far milder than the incident at issue in *Clark County*, Ogle could not reasonably have believed that the comment was so severe as to alter the conditions of her employment and create an abusive working environment. Quite the opposite, Ogle testified that Carmon "automatically backed down" from this statement after Ogle responded "right away" that men may have run grocery areas 20 years ago, but women have since come on board [DE 28-2 at 8-9]. And, as Ogle testified, Carlson, who was present for Carmon's comment, also responded to Carmon during the team meeting, and Carmon "agreed,"

9

and conceded that "times have changed" [DE 28-2 at 8].

Based on Ogle's testimony, a jury might conclude that she was surprised that Carmon was oblivious to how much gender roles had changed in the grocery business over the last 20 years. But no reasonable jury could find that she reasonably believed this isolated incident was "extremely serious," as required to be actionable under Title VII. *Clark County*, 532 U.S. at 271 (citing *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998)).

**B.     Antonetti's Reference to a Male Employee as "Cheryl"**

Ogle's complaint to Carlson about Antonetti's reference to a male store manager as "Cheryl" is also not protected under Title VII. The problem is that Ogle fails to explain – and I fail to see – how this complaint concerns a type of discrimination prohibited by Title VII.

Ogle's brief suggests that her theory might be that Antonetti's comment constituted harassment based on sexual preference or orientation. For example, Ogle contends that, after she questioned Antonetti about the comment, Bob Zalud said, "I think he has gay tendencies, don't you, Teresa?" [DE 28-2 at 11].

But even if Ogle had a sincere belief that she was complaining about unlawful conduct in bringing Antonetti's reference to Carlson's attention, that belief was unreasonable. In the context of Title VII, the Seventh Circuit has consistently held that harassment based on sexual preference or orientation is not actionable. *Hamm*, 332 F.3d at 1062; *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1084 (7th Cir. 2000); *Hamner*, 224 F.3d at 707.

**C.     Antonetti's Derogatory Comments to Ogle**

Ogle also complained to Carlson about Antonetti's remarks to her that she "was going to cause him to have a heart attack," that she embarrassed him, and that, some days, he "could just

stab [her] eyes out with a fork" [DE 28-2 at 12]. These complaint are also not protected. There's nothing in the record to indicate that Ogle even subjectively believed, at the time she complained to Carlson, that Antonetti made these comments "because of" her sex or gender, which is what Title VII requires. *Hamm*, 332 F.3d at 1066.

As noted, Ogle was not required to use the magic words "sex" or "gender discrimination" to bring her complaints about these remarks within Title VII's retaliation protections. But "she has to at least say something to indicate her [gender] is an issue." *Sitar v. Indiana Dept. of Transp.*, 344 F.3d 720, 727 (7th Cir. 2003) (quoting *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1007-08 (7th Cir. 2000)). However, nothing in Ogle's testimony concerning her complaint to Carlson provides an objective sign indicating that, at the time she complained, she believed Antonetti made these remarks because of her gender, or believed that she was otherwise questioning conduct that violated Title VII [DE 28-2 at 13]. Ogle's testimony may show that she believed Antonetti was singling her out for mistreatment, but not because of her sex or gender. *Cf. Sitar*, 344 F.3d at 727 (retaliation claim failed because plaintiff "complained only that she felt picked on"); *see also Fox v. Eagle Distrib. Co., Inc.*, 510 F.3d 587, 592 (6th Cir. 2007) (vague allegation that manager was "out to get him" was insufficient to constitute engaging in protected activity).

As noted above, Ogle's July 26, 2007 "to whom it may concern" letter also makes reference to these remarks [DE 28-2 at 41]. Still, nothing in the letter indicates that she believed Antonetti made the remarks because of her sex or gender. And, clearly, nothing on the face of the remarks themselves raises an issue of sex or gender. Accordingly, though Antonetti's remarks were insulting, Ogle's complaint about them does not meet the statutorily protected

11

threshold.

### D. Preferential Treatment

This leaves only Ogle's general contention that she complained to Carlson about male favoritism in the workplace [DE 28 at 4]. Here's how Ogle herself described it:

> Q: Did you complain to Cynthia Carlson on any other occasion about Steve . . . Antonetti?
>
> \*\*\*
>
> A: I discussed with Cynthia about the sexual harassment as far as him being more – maybe not sexual harassment but as far as Steve – I mean, it was a market joke that, you know, Steven and his boys are, Steve backed his boys.
>
> Q: Can you be a little more specific please with respect to what you told Cynthia, what, what your conversations with Cynthia were about?
>
> \*\*\*
>
> A: I made comments to Cynthia about Steve showing favoritism and Steve – it being a male environment, that was, you know, I believe that was part of sexual discrimination. I talked to Cynthia about the different, as far as favoritism between men and women at market level.

[DE 28-2 at 19].

The general statement that "Steve backed his boys" is altogether too generic and vague to rise to the level of statutorily protected activity. *Cf. Durkin v. City of Chicago*, 341 F.3d 606, 615 (7th Cir. 2003) (vague complaints that did not speak directly of harassment insufficient to support a retaliation claim).

Ogle's testimony regarding Antonetti's "favoritism between men and women" appears to come closer to establishing protected activity, but the record shows that it falls short of the mark. Disparate treatment of women compared to men is of course unlawful under Title VII. *See Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 750–52 (7th Cir. 2002). But Ogle fails to present any evidence that she ever complained about any specific instances of disparate treatment. For

example, Ogle contends that the "male team members did not have as high goals" as she did [DE 28 at 5]. But the portion of the record Ogle cites for this contention does not support it. Ogle points only to her testimony that other market managers "didn't have profit goals like the fresh area and grocery had profit goals" [DE 28-2 at 19]. But nothing in this testimony suggests that Ogle believed she was held to more stringent goals *because* she was female, or that other market managers in the six-member team [DE 24-2, ¶ 3] were not required to meet comparable profit goals *because* they were male. Indeed, Ogle's testimony on this issue does not even mention the gender of the other market managers.

Ogle also contends that "Antonetti did not treat other Market Team members as poorly as he treated [her]" [DE 28 at 5]. But this complaint is also devoid of any indication that gender is at issue, particularly given that one of the other managers on the six-member team, Angie Gaydos, was female. Certainly nothing on the face of the contention implicates sex or gender.

Moreover, Ogle's testimony shows that she did not even subjectively believe she was singled out for mistreatment because of her gender. The portion of the record Ogle cites in support of this contention specifically mentions Gaydos as among the market team members who Ogle believes were treated better than her: "Out of our whole market team, Angie [Gaydos], Heath, Kevin, and myself, I was the only one who did interviews. I was the only one who hired. I was the only one who coached anybody" [DE 28-2 at 15]. What's more, here again, Ogle never contends – nor does the record contain clear evidence – that she lodged this particular complaint with Carlson or others.[2]

---

[2] Ogle did testify that the male attendees of the July 13, 2007 market team meeting had gone to lunch together, and that she and the only other female among the six market team members, Angie Gaydos, had not been invited to join them [DE 28-2 at 9]. However, Ogle does

In sum, once Ogle's general description of "favoritism between men and women" is broken down and analyzed, it becomes clear that Ogle wasn't engaged in statutorily protected activity because the complaints had nothing to do with her gender. Instead, her complaints were about Antonetti picking on her for other reasons.

To summarize: Ogle certainly registered several complaints with Carlson. But none of the various complaints that Ogle made about the treatment she received in the workplace are protected activity because no one could reasonably believe that what she was complaining about violated Title VII. And even if they are protected, the complaints were not the cause of her demotion. That is the subject I turn to next.

## II.     Causal Connection

As noted above, Ogle makes it clear in her brief that the adverse action that she suffered was her demotion in August 2007 [DE 28 at 121]. With respect to the causal connection requirement, the Seventh Circuit requires that Ogle demonstrate that her complaints were a but-for cause of her demotion – *i.e.*, that she would not have been demoted had she not complained to Carlson. *See Serwatka v. Rockwell Automation, Inc.*, 591 F.3d 957, 963 (7th Cir. 2010) ("the omission of retaliation from [the list of mixed-motive claims added to Title VII by the Civil Rights Act of 1991] meant that . . . relief was unavailable to a plaintiff who had shown that retaliation was a motivating but not a but-for cause of the adverse employment action taken against him"); *Speedy v. Rexnord Corp.*, 243 F.3d 397, 406 (7th Cir. 2001) (same); *see also Haywood*, 323 F.3d at 531.

---

not contend – and the record provides no basis to infer – that she ever complained to Carlson or anyone else about this incident.

It's true that some less recent Seventh Circuit panels have analyzed the causal link element as requiring only a mixed-motive showing – *i.e.*, a showing that Ogle's complaints to Carlson were "a substantial or motivating factor" in her demotion. *Gates v. Caterpillar, Inc.* 513 F.3d 680, 686 (7th Cir. 2008); *see also Culver v. Gorman and Company*, 416 F.3d 540, 545 (7th Cir. 2005). But the difference between the but-for and mixed-motive standards is immaterial here, since Ogle's claim fails even under the less demanding mixed-motive standard.

Ogle attempts to make her case for a causal connection based on circumstantial evidence, which is, of course, perfectly permissible. *Sylvester v. SOS Children's Vills. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Circumstantial evidence can be any type of proof that may allow for an inference of retaliation. *Id.* at 903. It can include things like suspicious timing, ambiguous statements, behavior towards other employees, unfavorable treatment compared to similarly situated employees, and so on. *See Volovsek v. Wisc. Dept. Agric. Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003).

Ogle relies essentially on the suspicious timing of her complaints to Carlson and her demotion which occurred at the earliest 41 days later. But just because something occurs after the fact does not mean – without more – that it occurred because of the fact. Indeed, it is a "rare occasion" where suspicious timing will be sufficient in and of itself to create a triable issue. *Culver*, 416 F.3d at 546. *See Sauzek v. Exxon Coal USA, Inc*., 202 F.3d 913, 918 (7th Cir. 2000) ("[T]he mere fact that one event preceded another does nothing to prove that the first event caused the second."); *Buie v. Quad/Graphics, Inc*., 366 F.3d 496, 506 (7th Cir. 2004); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (plaintiff "needs more than a coincidence of timing to create a reasonable inference of

retaliation") *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (same). In all but the most rare of cases, in addition to "suspicious timing," a plaintiff "must produce facts which somehow tie the adverse decision to the [plaintiff's] protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

Unfortunately for Ogle, her evidence for a causal connection appears to be limited to the supposed temporal proximity between her complaints to Carlson and her subsequent demotion [DE 28 at 12].[3] She contends that she "began complaining to Carlson regarding Antonetti's favoritism towards male market employees in February or March 2007" [DE 28 at 12]. The interval between the latter of these dates (March 2007) and her demotion (August 24, 2007) is too lengthy to support an inference of suspicious timing. *Cf. Longstreet v. Ill. Dep't. of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002) (four-month gap was insufficient to establish a causal connection); *Sauzek*, 202 F.3d at 919 (three-month gap alone could not reasonably support a causal connection for a retaliation claim). And Ogle does not specify other, more recent, dates on which she complained to Carlson about Antonetti's alleged favoritism.

Tracing back from the date of her demotion, and reading the record in the light most favorable to Ogle, the most recent occasion on which she complained to Carlson was July 14, 2007, when she took issue with Carmon's comment from the meeting the day before. Giving Ogle the benefit of the doubt, she also may have complained to Carlson on this occasion about

---

[3]Ogle does argue that retaliation can also be inferred by the fact that the assistant manager position to which she was demoted is a step below the co-manager position she had occupied in 2003-06, during which her performance scores were "above standard" [DE 28 at 15]. But I fail to see how this suggests a retaliatory motive, particularly given that Ogle was never terminated, despite that her performance reviews specifically threatened termination if her performance did not improve.

Antonetti's preferential treatment of male team members. After all, Ogle testified that she spoke to Carlson several times—"maybe five" times—about this issue; and, for all I can determine from the present record, July 14, 2007 may have been one of those occasions.

The 41-day interval between Ogle's July 14, 2007 complaint to Carlson and her August 24, 2007 demotion could be short enough to bolster an inference of suspicious timing. *See Magyar v. Saint Joseph Regional Medical Center,* 544 F.3d 766, 772 (7th Cir. 2008) ("This court has found a month short enough to reinforce an inference of retaliation.") (citing *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 786-87 & 793 (7th Cir. 2007) (jury could infer intent to retaliate where adverse action occurred just one month after complaints about discrimination); *but see Jasmantas v. Subaru-Isuzu Auto., Inc*., 139 F.3d 1155, 1158 (7th Cir. 1998) (one month gap between protected conduct and discharge insufficient to establish retaliatory link absent other evidence).

But this still leaves Ogle with the requirement that she provide evidence *in addition to* temporal proximity that ties her demotion to the alleged protected activity. And, as I noted, she points to nothing other than temporal proximity to support the causation element of her *prima facie* case.

Moreover, whatever support the (at-best) 41-day interval might provide for an inference of retaliation, that support is largely negated by Ogle's progressively negative performance evaluations, which started to decline well before her July 14, 2007 complaint to Carlson. Starting at least in March 2007, Antonetti warned Ogle about how she was running the stores [DE 24-3 at 113-14]. And in the following month, Antonetti gave Ogle a formal written and oral

performance review where he noted a number of areas in which she needed to improve [DE 24-3 at 77 & 122-24]. Then in May, Antonetti gave Ogle an evaluation where he told her she wasn't meeting objectives and outlined ten specific areas for improvement [DE 24-3 at 82-83 & 125].

Where the events that set a disciplinary decision in motion precede the protected activity, courts have found that suspicious timing will not support a retaliation claim. *Long v. Teachers' Retirement System of the State of Illinois*, 585 F.3d 344, 354 (7th Cir. 2009). As the *Long* court put it: "While a sudden decline in performance evaluations after an employee engages in a protected activity may provide circumstantial evidence of discriminatory intent, a decline in performance before the employee engages in protected activity does not allow for an inference of retaliation." *Id.*

The undisputed evidence shows that Ogle was heading toward disciplinary action, including possible termination, well before her July 14, 2007 complaint to Carlson. Her May 21, 2007 written review already shows a decline in her performance and specifically warns that, if her current behavior continues, the next level of action could include termination [DE 24-3 at 125]. Ogle was then told that they would revisit the issue of her performance deficiencies in July [DE 24-3 at 126].

So at the time she complained to Carlson about Carmon's comment, Ogle had every reason to believe that her termination could be imminent. Indeed, Ogle concedes that, by July 19, 2007, she was well below meeting her performance expectations with respect to sales goals [DE 24-3 at 88]. Accordingly, the decline in Ogle's performance reviews, from the Spring of 2007 right through to Ogle's demotion, largely undermines an inference of retaliation based only on suspicious timing. *Cf. Moser v. Ind. Dept. of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005)

(explaining that "numerous incidents brought [employee's] professionalism and ability . . . into question" and thereby undermined any inference of suspicious timing); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 321 (7th Cir. 1992).

It's true that Ogle says she began complaining about Antonetti much earlier than July 2007– in February or March of 2007 – and that this time period *precedes* her negative May 21, 2007 review. But those earlier dates are not close enough to her demotion date to support a causation inference based on suspicious timing. *Cf. Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) (any "inference of causation weakens as the time between the protected expression and the adverse action increases thus requiring additional proof of a causal nexus").

And, in any event, Ogle's testimony indicates that her complaint about Carmon's comment on July 13, 2007 at the team meeting provides the principal, if not the exclusive, support for her retaliation claim:

> Q: What, what – is there anything else besides the comment that David Carmon made and your opposing that comment on July 13th that you are saying you were retaliated against?
>
> A: No.

[DE 28-2 at 9]. Thus, Ogle's July 14, 2007 complaint is, for her, the most favorable date against which I can compare the timing of her declining performance evaluations. Yet, her poor performance reviews had already started coming in well before that date.

Under these circumstances, no reasonable jury could infer that Ogle was demoted because of her complaints to Carlson rather than for her poor job performance. In other words, Ogle cannot satisfy a but-for causation standard. Moreover, Ogle's claim would not survive even under a mixed-motive standard, since, on this record, a reasonable jury would be unable to

conclude that Ogle's complaints to Carlson were even a "substantial or motivating factor" in the decision to demote her.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendant Wal-Mart's motion for summary judgment [DE 23]. Because this ruling disposes of all the issues in this case, the clerk shall **ENTER FINAL JUDGMENT** in favor of Wal-Mart stating that plaintiff Teresa Ogle is entitled to no relief on her complaint. The clerk shall treat this civil action as **TERMINATED**. All further settings in this action are hereby **VACATED**.

**SO ORDERED**.

ENTERED: September 23, 2011

                                                                  s/ Philip P. Simon
                                                                   PHILIP P. SIMON, CHIEF JUDGE
                                                                   UNITED STATES DISTRICT COURT